UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GLADES PHARMACEUTICALS, LLC, ) <br> Plaintiff, ) <br> ) <br> against ) <br> ) Case Number _____ <br> CALL, INC., doing business as ) <br> PHARM FORCE, ) <br> ) **COMPLAINT** <br> Defendant. ) <br> _____ ) | |

Plaintiff Glades Pharmaceuticals, LLC ("Glades"), by its undersigned attorney, Thomas E. Butler, Jr., Esquire, as and for its Complaint against Call, Inc., doing business as Pharm Force, alleges as follows:

NATURE OF THE ACTION

1. This action is based on the anti-competitive and tortious conduct of defendant Call, Inc., doing business as Pharm Force (referred to herein as "Pharm Force"), a pharmaceutical distribution company that competes directly against Glades. Glades has recently discovered that Pharm Force conspired with a former Glades executive, Brendan Murphy, to misappropriate Glades' property, infringe on Glades' copyrighted material and divert Glades' business opportunities in order to pursue its own competitive activities. In addition, Glades also has discovered that Pharm Force knowingly and deliberately induced Murphy to violate his fiduciary obligations to Glades by actively participating in the diversion of valuable business opportunities from Glades during Murphy's employment.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, as plaintiff and defendant are citizens of different States and the matter in controversy is in excess of $75,000 exclusive of interest and costs. The Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1338 and 1367 and 17 U.S.C. §§ 101 et seq.

3. Venue is proper in this district pursuant to 28 U.S.C. §§ 1400 and 1391(c).

## THE PARTIES

4. Glades is a limited liability company, created under the laws of the State of Florida, with its principal place of business in the State of Georgia. Glades' sole member is located in the State of Georgia and/or Florida. At all relevant times, Glades has been and still is engaged in the business of, among other things, developing, marketing and distributing non-branded versions of branded dermatological products. The dermatological products that Glades markets and distributes are commonly referred to by the public as "generic" products.

5. Glades is a subsidiary of Stiefel Laboratories, Inc. ("Stiefel"), which is a privately held corporation engaged in the development, marketing and distribution of dermatological products. Stiefel is incorporated in the State of New York, and maintains its world headquarters and a place of business in Coral Gables, Florida.

6. Call, Inc, doing business as Pharm Force, is, upon information and belief, a Pennsylvania company engaged in the business of pharmaceutical sales and distribution.

## FACTUAL BACKGROUND

Pharm Force's Participation in the Diversion
of Valuable Business Opportunities from Glades

7. Brendan Murphy is an individual presently residing in the State of Georgia. Murphy served as the President of Glades from 1994 to 2002. Thereafter, from January 2003 to approximately May 2, 2003, Murphy served as Glade's Vice President, Business Development and Outsourcing. In addition, from June 2001 to approximately October 23, 2002, Murphy also served as Stiefel's Vice President of Sales, responsible for managing Stiefel's sales force.

8. Among Murphy's primary responsibilities as a senior executive officer and employee of Glades was to explore, develop and pursue business opportunities for Glades, including efforts to secure on behalf of Glades the right to market and/or distribute non-branded dermatological products that are equivalent to name brand products.

9. Glades has discovered, however, that beginning in early 2003, Murphy flagrantly violated both his fiduciary obligations as an officer of Glades and his duty of loyalty as a Glades employee by knowingly and deliberately diverting for himself several valuable business opportunities, including an opportunity to market and/or distribute the non-branded equivalent of a popular medicated shampoo. As described more fully below, Glades has also discovered that Pharm Force was an active participant in Murphy's unlawful conduct.

10. Specifically, and upon information and belief, Murphy entered into discussions with Pharm Force in early 2003 regarding the pursuit of a joint business venture to market and distribute generic pharmaceuticals in competition with Glades. At that time, Murphy was Glades' Vice President, Business Development and Outsourcing, and Pharm Force had full knowledge of Murphy's position as an officer of Glades. Despite that knowledge, however, upon information and belief, the discussions between Murphy and Pharm Force resulted in an agreement between Murphy and Pharm Force to misappropriate and utilize Glades' resources,

property and business opportunities to pursue business opportunities for their own financial benefit to the detriment of Glades.

11. Thereafter, pursuant to their agreement, Pharm Force and Murphy actively pursued a business arrangement with Janssen Pharmaceuticals, Inc., a subsidiary of Johnson & Johnson, Inc. ("Janssen") regarding the distribution of a non-branded ketaconazole shampoo that would be a generic version of the Nizoral brand shampoo currently being sold by Janssen (the "Nizoral Generic"). The distribution of a Nizoral Generic was an extremely valuable business opportunity that Glades would have pursued vigorously if Murphy had brought that opportunity to Glades' attention. Rather than bringing this lucrative business opportunity to the attention of Glades, however, Murphy and Pharm Force instead pursued this opportunity for their own benefit and deliberately concealed it from Glades -- all during Murphy's employment as Glades' Vice President, Business Development and Outsourcing.

12. Upon information and belief, Murphy and Pharm Force discussed their plans for the Nizoral Generic deal as early as February 2003 when Murphy was attending an industry conference in Orlando, Florida on behalf of and at the expense of Glades. Rather than pursue a business opportunity for Glades, however, Murphy and Pharm Force were instead conspiring to pursue that business opportunity for themselves. At all times relevant hereto, Murphy and Pharm Force acted in concert and jointly pursued the Nizoral Generic deal for their mutual benefit, at the expense of Glades.

13. Numerous e-mail communications between Murphy and Pharm Force make clear the development of their plan to pursue the marketing and/or distribution of the Nizoral Generic. Murphy's communications with Pharm Force regarding the sale and distribution of the Nizoral Generic began during Murphy's employment as Glades' Vice President, but Murphy and Pharm Force deliberately concealed those communications from Glades in order to pursue this valuable business opportunity for themselves.

14. While Murphy and Pharm Force were pursuing that valuable business opportunity on their own behalf and for their own benefit, Murphy and Pharm Force actively

concealed their activities from Glades by communicating through Murphy's personal e-mail addresses at "Yahoo.com" and "Bellsouth.net" to further their activities. Pharm Force was aware at that time that Murphy's normal business communications were made through his business e-mail address: "bmurphy@stiefel.com." Pharm Force and Murphy deliberately avoided using Murphy's business email address when pursuing the Nizoral Generic opportunity to avoid detection by Glades and to keep the Nizoral Equivalent business opportunity for themselves.

15. The communications between Murphy and and Pharm Force reveal that Murphy and Pharm Force were actively pursuing a business opportunity for their own benefit, while Murphy was serving as a senior executive officer of Glades. For example, in one e-mail from Pharm Force's President Joseph Pecora to Murphy in or about February 2003, Pecora asked Murphy: "What is the investment and/or cost that Bi-Coastal [another party to the proposed business opportunity] has to make to pull this shampoo deal off?" Pecora also suggested in the e-mail that he had assumed that "Janssen [the producer of Nizoral shampoo] gets 10% of upside in sales throughout the contract and 35% of the generic sales throughout the contract." Thus, this e-mail reveals that, while Murphy was still employed by Glades, Murphy and Pharm Force were discussing the terms of a lucrative contract with Janssen for the right to market and/or distribute a Nizoral Generic.

16. During the time Murphy and Pharm Force were surreptitiously pursuing the Nizoral Generic business opportunity for their own personal benefit, Pharm Force was well aware that Murphy was a Glades Vice President responsible for business development and outsourcing for Glades, including the pursuit of distribution and marketing rights for non-branded dermatological products such as the Nizoral Generic. Notwithstanding Pharm Force's knowledge of Murphy's job responsibilities and his obligations to Glades and Stiefel, Pharm Force actively participated in Murphy's unlawful conduct by assisting Murphy in the misappropriation of Glades' material and the diversion of Glades' business opportunities.

**Pharm Force's Infringement of**
**Glades' Copyrighted Material and**
<u>**Misappropriation of Glades' Proprietary Material**</u>

17. The scheme between Murphy and Pharm Force to seize the Nizoral Generic opportunity for themselves was accomplished in large part by their blatant misappropriation and infringement of a Glades PowerPoint presentation to pursue the opportunity to distribute or market the Nizoral Generic. (A copy of Glades' PowerPoint presentation is annexed hereto as Exhibit A.)

18. The Glades PowerPoint presentation was prepared by Glades' President, Jeffrey Thompson, several months prior to the termination of Murphy's employment. The Glades PowerPoint presentation is an original, independently created presentation created solely by Glades to assist it in the solicitation of business on its behalf from various companies. The Glades PowerPoint presentation was designed solely by Glades and contains a unique and original format and design, including the selective description of specific reasons why a potential business partner should choose to do business with Glades, as well as the order and the manner of presenting the information contained in the PowerPoint presentation. The Glades PowerPoint presentation also contains an independently created manner of describing Glades' history, its particular strengths and its business strategies and operations. The Glades PowerPoint presentation also contains market and sales data that was compiled by Glades at great expense and after a selective determination as to what data should be included and the manner in which that data should be presented.

19. During his employment with Glades, Murphy was entrusted with a copy of the Glades PowerPoint presentation to assist him in the pursuit of business opportunities for Glades. At no time was Murphy authorized to use the Glades PowerPoint presentation for any other purpose. Nor was Murphy authorized to keep a copy of the Glades PowerPoint presentation following the termination of his employment with Glades.

20. On February 13, 2004, Glades obtained a certificate of registration of the Glades PowerPoint presentation from the Copyright Office of the United States. Glades has

been and still is the owner of the entire right, title and interest in and to the Glades PowerPoint presentation, as well as the copyrights thereon and the registration thereof.

21. In furtherance of their efforts to secure the Nizoral deal, Murphy and Pharm Force knowingly and deliberately infringed upon Glades' copyright by misappropriating the Glades PowerPoint presentation from Glades, copying the Glades PowerPoint presentation without authorization, transmitting and publishing the Glades PowerPoint presentation to others without authorization, and improperly using that presentation to attempt to secure the Nizoral Generic business opportunity for themselves. Specifically, on May 13, 2003, Murphy sent a PowerPoint presentation to Pharm Force entitled: "Nizoral Shampoo Generic Market Potential." Murphy proposed that this document be used by him and Pharm Force to make a presentation to Janssen to try to obtain a Nizoral Generic deal for themselves. Murphy and Pharm Force's President, Joseph Pecora, shared their comments concerning revisions to the PowerPoint presentation in e-mails exchanged on May 14, 2003.

22. The PowerPoint presentation copied by Murphy and Pharm Force is virtually identical to the PowerPoint presentation prepared by Glades several months earlier. Indeed, throughout the presentation copied by Murphy and Pharm Force, Pharm Force simply substituted its own name for Glades, thereby falsely claiming Glades' strategies, history and accomplishments as those of Pharm Force. (A copy of the PowerPoint presentation utilized by Pharm Force is annexed hereto as Exhibit B.) Upon information and belief, Pharm Force had actual knowledge that the PowerPoint presentation belonged to Glades.

23. Following its receipt of the Glades PowerPoint presentation from Murphy, Pharm Force further infringed on Glades' copyright by participating in and assisting in the unauthorized presentation of Glades' copyrighted material to others, including Jannsen. These further acts of infringement include Pharm Force's active assistance to Murphy in preparing the Glades PowerPoint presentation for use with Janssen, with full knowledge that Pharm Force would present the Glades PowerPoint presentation to Janssen as its own in an effort to secure the Nizoral deal. In Murphy's May 14, 2003 e-mail to Pecora, Murphy even recommended leaving

in two of Glades' product charts to show "how Glades keep[s] up the price in a multi player market. The Emgel and Cleocin slides do the same thing against different competitors." Murphy went on to claim that, "[b]y keeping those 4 slides it shows we can delivery [sic] the results against any competitor." In fact, Pharm Force duplicated all of Glades' product sales charts in this presentation.

24.   In addition, Pharm Force misappropriated proprietary Information Management Systems ("IMS") data contained in the PowerPoint presentation it misappropriated from Glades. That IMS data provides Glades with detailed monthly projections regarding market demand and pricing for dermatological products. The IMS data, which is selectively ordered and internally processed and evaluated by Stiefel and Glades, provides Glades with a distinct competitive advantage and helps Glades develop its business and marketing strategies. Upon information and belief, Murphy and Pharm Force utilized the IMS data to further their competitive activities to the detriment of Glades.

25.   Upon information and belief, beginning in the summer of 2003, Pharm Force, in conjunction with Murphy, presented the Glades PowerPoint presentation and the data contained therein to Janssen and other potential business partners in an effort to secure for themselves various business opportunities, including the Nizoral Generic deal. Also upon information and belief, Pharm Force continues to utilize Glades' PowerPoint presentation to pursue its own competing business activities.

26.   Had Glades been presented with the Nizoral Generic business opportunity, Glades would have pursued that venture and there is a strong likelihood that Glades would now be marketing or distributing the Nizoral Generic and enjoying the substantial profits associated with that product. Thus, by knowingly and intentionally assisting Murphy in the diversion from Glades of this valuable business opportunity to market or distribute the Nizoral Generic, Pharm Force has directly and proximately caused Glades to suffer the loss of substantial revenue it may have otherwise enjoyed if it had been presented with the Nizoral Generic opportunity in a timely manner.

27. In addition, Glades has suffered further substantial damages as a direct and proximate result of Pharm Force's unlawful participation in, and inducement of, Murphy's breach of fiduciary obligations to Glades. Those damages include Glades' payment to Murphy of compensation in excess of $632,000 in wages and benefits during the time that Pharm Force was actively assisting Murphy in violating his obligations to Glades. Had Glades been aware of Pharm Force's participation with Murphy in these anti-competitive activities, Murphy's employment with Glades would have been summarily terminated and Glades would not have paid Murphy any of the compensation he actually received during the period of his misconduct.

28. Moreover, upon information and belief, Pharm Force's participation in Murphy's unlawful conduct caused Glades to suffer further damages by causing Glades to unwittingly fund Murphy's and Pharm Force's competitive activities. Among other things, Murphy and Pharm Force utilized Glades' time, resources and money to further their efforts to secure the Nizoral Generic deal for themselves.

29. In addition to Pharm Force's participation in the diversion of the Nizoral Generic business opportunity, Glades has discovered that Pharm Force has actively assisted Murphy in the diversion of additional business opportunities during Murphy's employment with Glades so that Murphy and Pharm Force could pursue those business ventures for themselves. Those additional business opportunities that were diverted from Glades with Pharm Force's active assistance include, without limitation, opportunities to market and/or distribute products containing the active ingredients of urea, sodium sulfacetamide, lidocaine and ammonium lactate.

30. Specifically, during Murphy's employment with Glades, Murphy and Pharm Force surreptitiously utilized Glades' resources to obtain product information and data for the above-described products, including manufacturing quotes, product samples and ingredient lists. Rather than utilizing that information and data for the benefit of Glades, however, Murphy and Pharm Force instead utilized that information and data to pursue valuable opportunities to market and/or distribute those products for themselves. Moreover, Murphy and Pharm Force

deliberately concealed those business opportunities from Glades so that Murphy and Pharm Force would obtain for themselves the ability to market and/or distribute competing products.

31.  If Murphy had presented those opportunities to Glades, as he was required to do, Glades would have pursued those business opportunities and would be enjoying the substantial profits that would have arisen from those opportunities. Instead, and as a direct result of the diversion of those corporate opportunities by Murphy and Pharm Force, Murphy and Pharm Force have commenced the sale and/or distribution of those products and are enjoying the substantial profits associated with those activities.

32.  In addition to the business opportunities described above, Glades believes that Pharm Force assisted Murphy in diverting additional business opportunities while Murphy was still employed by Glades, the full extent of which is not presently known. Glades therefore reserves the right to seek leave to amend its claims against Pharm Force as additional evidence of their misconduct is discovered.

FIRST CAUSE OF ACTION
(Copyright Infringement)

33.  Glades repeats and realleges the allegations set forth in paragraphs 1 through 32 as if fully set forth herein.

34.  Glades is the creator and sole owner of the original text and material contained in the Glades PowerPoint presentation, which was first published by Glades in December 2002.

35.  Glades has complied with the federal Copyright Act's registration and deposit requirement by duly filing an application for registration with the Copyright Office of the United States and obtaining a certificate of registration of the Glades PowerPoint presentation on February 13, 2004.

36.  Glades has been and still is the owner of the entire right, title and interest in and to the Glades PowerPoint presentation, as well as the copyrights thereon and the registration thereof.

37. Without the consent of Glades and in complete disregard of Glades' rights, Pharm Force has infringed and is infringing upon Glade's copyrights throughout the United States by publishing and utilizing the Glades PowerPoint presentation to pursue its own business relationships and to compete with Glades.

38. As a result of Pharm Force's infringement of Glades' copyrighted work, Glades has suffered monetary damages, including the costs Glades incurred in creating the copyrighted material and obtaining the data contained therein, as well as the lost profits Glades would have otherwise enjoyed but for Pharm Force's unauthorized and infringing use of Glades' copyrighted work.

39. In addition, upon information and belief, Pharm Force still has possession of the Glades PowerPoint presentation and will continue to utilize that material for its own competitive activities. Unless Pharm Force is enjoined and restrained from any further unauthorized and infringing use of Glades' copyrighted works, Glades will suffer irreparable harm, damage and injury in that the use of Glades' copyrighted material by a competitor will severely diminish the value of the Glades PowerPoint presentation and destroy the distinctiveness of the work and its identity as being the exclusive property of Glades.

<u>SECOND CAUSE OF ACTION</u>
(Aiding and Abetting Breach of Fiduciary Duty/Duty of Loyalty)

40. Glades repeats and realleges the allegations set forth in paragraphs 1 through 39 as if fully set forth herein.

41. As a senior executive officer of Glades, Murphy owed Glades a fiduciary obligation to discharge his duties diligently and in good faith, to act at all times in Glades' best interests, to place Glades' interests above his own personal interests, and to avoid deriving personal profit at the expense of Glades.

42.     Moreover, as a senior executive officer and employee of Glades, Murphy also had an undivided and unqualified duty of loyalty to Glades which obligated him to act, at all times, in Glades' best interests.

43.     Pharm Force knowingly and willfully aided and abetted Murphy's violation of his fiduciary obligations by actively participating in Murphy's deliberate diversion from Glades of valuable business opportunities, and by pursuing those business opportunities for its own financial gain through the unauthorized use of Glades' copyrighted material and Glades' proprietary and confidential information.

44.     Pharm Force further aided and abetted Murphy's breach of fiduciary duty by assisting Murphy in actively concealing from Glades valuable business opportunities so Pharm Force could pursue those business opportunities for its own financial gain.

45.     Pharm Force further aided and abetted Murphy's breach of fiduciary duty by actively participating in the infringement of Glades' copyrighted material, the misappropriation of Glades' property and the use of that property in furtherance of its pursuit of those business opportunities for its own financial gain.

46.     As a direct and proximate result of Pharm Force's active inducement of and participation in Murphy's breaches of his duty of loyalty and fiduciary obligations to Glades, Glades has suffered damages consisting of the profits it would have enjoyed but for the diversion of those valuable corporate opportunities by Pharm Force and Murphy, as well as the sum of more than $632,000 in compensation and benefits Glades paid Murphy during the period Pharm Force was aiding and abetting Murphy's breach of his duty of loyalty and fiduciary obligations to Glades, as well as the cost of additional Glades resources wrongfully utilized by Murphy and Pharm Force to further their own competitive activities.

47.     In addition, due to the egregious and deliberate nature of Pharm Force's misconduct, Glades is each entitled to an award of punitive damages in the amount of at least $500,000.

## THIRD CAUSE OF ACTION
(Conversion)

48. Glades repeats and realleges the allegations set forth in paragraphs 1 through 47 as if fully set forth herein.

49. During his employment with Glades, Murphy was entrusted with proprietary material prepared by Glades for the sole purpose of generating business opportunities for Glades. That material was and still is the sole property of Glades.

50. Despite Glades' ownership of that material, however, Pharm Force knowingly and willfully misappropriated and converted that material from Glades to advance its own competing interests, all to the detriment of Glades. Among other things, Pharm Force used the material it misappropriated from Glades to try to obtain for itself the right to market and distribute the Nizoral Generic business opportunity, as well as other business opportunities. If the material had been used by Glades instead of Pharm Force, Glades could have obtained the right to market or distribute the Nizoral Generic deal, as well as the additional business opportunities diverted by Pharm Force and Murphy.

51. As a direct and proximate result of Pharm Force's misappropriation and conversion of Glades' property, Glades has suffered substantial damages consisting of the profits it might have enjoyed but for Murphy's misappropriation and unauthorized use of Glades' property.

52. Moreover, Pharm Force has failed and refused to return to Glades all copies and versions of the Glades proprietary material it converted.

53. In addition, due to the egregious and deliberate nature of Pharm Force's misconduct, Glades is entitled to an award of punitive damages in the amount of at least $500,000.

## FOURTH CAUSE OF ACTION
(Unjust Enrichment)

54. Glades repeats and realleges the allegations set forth in paragraphs 1 through 53 as if fully set forth herein.

55. As a result of Pharm Force's unlawful conduct, including its assistance in Murphy's breach of fiduciary duties and misappropriation of Glades' proprietary material, Pharm Force has been unjustly enriched in an amount equal to the value of the material it misappropriated from Glades, as well as the profits it enjoyed as a direct result of its use of Glades' property.

56. The circumstances are such that in equity and good conscience, Pharm Force must remit to Glades the full value of all the material it misappropriated from Glades, as well as the value of Glades' resources wrongfully used by Murphy and Pharm Force to further their own competitive activities and the profits Pharm Force has enjoyed from the business opportunities it diverted from Glades.

## FIFTH CAUSE OF ACTION
(Conspiracy)

57. Glades repeats and realleges the allegations set forth in paragraphs 1 through 56 as if fully set forth herein.

58. Pharm Force agreed to participate in transactions with companies brought to it by Murphy and to compensate Murphy for his efforts in bringing about the transactions, despite the knowledge that Murphy had a fiduciary duty to bring those transactions to his employer, Glades. Pharm Force was aware that Murphy was using proprietary materials of Glades to misrepresent the capabilities and history of Pharm Force to fraudulently induce third parties to enter into transactions with Pharm Force.

59. In entering into this conspiracy, Pharm Force and Murphy intended, without justification of any kind, to harm Glades by fraudulently inducing third parties to enter into transactions to the benefit of Pharm Force and to the detriment of Glades' participation in those transactions, for which Glades was paying Murphy to generate.

60. In furtherance of this conspiracy, Pharm Force and Murphy, on numerous occasions, took overt action by falsely representing that the Glades PowerPoint presentation represented Pharm Force's capabilities and history.

61. As a direct and proximate result of Pharm Force's and Murphy's actions in furtherance of the conspiracy, Glades sustained substantial harm, including loss of the business opportunities diverted from it and the resulting revenues and profits of the transactions it was deprived of.

62. The actions of Pharm Force were outrageous, intentional and malicious so as to justify an award of punitive damages.

**WHEREFORE**, Plaintiff Glades demands:

A. That the Court preliminarily and permanently enjoin and restrain Call, Inc., doing business as Pharm Force, from directly or indirectly printing, reprinting, publishing, copying, presenting or in any other way utilizing copies, modifications or reproductions of Glades' copyrighted works, either in whole or in part.

B. That the Court direct Pharm Force to notify in writing all persons to whom it has published, presented or in any way communicated all or part of Glades' copyrighted material that, at all times, the material was the property of Glades, and that Pharm Force was not authorized to utilize that material for any purpose.

C. That the Court award Plaintiff Glades damages in an amount equal to the costs Glades incurred in creating the copyrighted material, including the costs of acquiring the data contained therein, the revenue lost by Glades as a result of Pharm Force's unauthorized use

of Glades' copyrighted material, all remuneration paid to Murphy by Glades and all profits Pharm Force has enjoyed as a result of its infringement on Glades' copyrighted material.

      D.    That the Court award Plaintiff Glades compensatory damages in an amount equal to the value of the material Pharm Force misappropriated from Glades and the profits Pharm Force has enjoyed from the business opportunities it diverted from Glades.

      E.    That the Court award Plaintiff Glades damages in an amount equal to the compensation it paid Murphy during the period Pharm Force was aiding and abetting Murphy's breaches of fiduciary duty, which is reasonably believed to be in excess of $632,000.00.

      F.    That the Court award Plaintiff Glades punitive damages in the amount of at least $500,000.

      G.    That the Court award Plaintiff Glades its reasonable attorneys' fees, expenses, and court costs incurred in bringing this action.

      H.    That the Court grant Plaintiff Glades any other appropriate relief as determined by this Court.

Dated: September 7, 2004

*[signature]*
THOMAS E. BUTLER, JR., ESQUIRE
Pa. Attorney I.D. No. 12022
Attorney for Plaintiff, Glades Pharmaceuticals, LLC

OF COUNSEL:

WEBER GALLAGHER SIMPSON
STAPLETON FIRES & NEWBY LLP
Suite 600, The Belgravia
1811 Chestnut Street
Philadelphia, PA 19103
215-972-7928
FAX: 215-717-0140
e-mail: tbutler@wglaw.com

- 16 -